Filed 3/25/16; pub. order 4/22/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ERIC RYDER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LIGHTSTORM ENTERTAINMENT,<br>INC., et al.,<br><br>    Defendants and Respondents. | B254922<br><br>(Los Angeles County<br>Super. Ct. No. BC474876) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alan S. Rosenfield and Susan Bryant-Deason, Judges.  Affirmed.

Rincon Venture Law Group, K. Andrew Kent, Gregory N. Albright; King, Cheng & Miller, James W. Colbert III and David P. King for Plaintiff and Appellant.

Mitchell, Silberberg & Knupp, Robert H. Rotstein, Aaron M. Wais and Emily F. Evitt for Defendants and Respondents.

\* \* \* \* \* \*

In this idea submission case, plaintiff Eric Ryder challenges the trial court's grant of summary judgment to defendants James Cameron and Lightstorm Entertainment, Inc. (Lightstorm), on claims that defendants fraudulently expressed interest in developing Ryder's science fiction story KRZ and used parts of that story in Cameron's 2009 film Avatar (20th Century Fox). As we explain, Ryder's contract and fiduciary duty claims fail because we find no similarity between the projects as a matter of law. Ryder's fraud claims fail because he has not offered evidence raising a triable issue of material fact. Finally, in light of those conclusions, his appeal of the court's denial of his motion for discovery sanctions is moot. We therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

### 1.  Cameron's Avatar

Released in 2009, Avatar is a science fiction film written and directed by Cameron. Set in the future on Pandora, a moon of a fictional gas giant planet, it explores a world of flying mountains and lush bioluminescent rainforests teeming with exotic flora and fauna unlike anything on Earth. An indigenous species of humanoids called Na'vi live there—10-foot-tall, blue-skinned, long-tailed, preternaturally strong beings living in harmony with their natural surroundings and worshipping their deity "Eywa." Pandora is also occupied by humans affiliated with the Resources Development Administration, or RDA, and its "Sec-Ops" security force, which mines a valuable mineral called "unobtainium" used on Earth. The film's title refers to genetically engineered "avatar" bodies resembling Na'vi that human scientists control via a mental link and use to interact with the native Na'vi.

The film begins as Jake Sully, a 22-year-old paraplegic ex-Marine, is brought to Pandora to replace his deceased twin brother as an avatar operator. Upon arriving, he meets Colonel Miles Quaritch, the imposing head of Sec-Ops, and Dr. Grace Augustine, head of the avatar program, among others. Jake begins training as an avatar operator, joyfully discovering his avatar allows him to experience walking again. Meanwhile, Quaritch recruits Jake to secretly provide intelligence on the Na'vi in exchange for expensive surgery to restore the use of his legs once back on Earth.

2

While out in the wilds of Pandora in his avatar form, Jake gets separated from his group when he is attacked by a panther-like predator, barely escaping by jumping into a rushing waterfall.  As night falls, Neytiri, a Na'vi female, finds him and is about to shoot him when a jellyfish-like "woodsprite" lands on her arrow.  She interprets that as a sign from Eywa and spares his life.  Later that night, she saves Jake when he is attacked by a pack of "viperwolves."  She refuses to bring him back to her village until woodsprites land all over his body.  She then brings him back to the gigantic "Hometree" where her clan lives and where her mother, the clan's spiritual leader, tells her to train him in the ways of the Na'vi.

In his avatar form, Jake trains to become a Na'vi warrior, while in his human form he continues to provide intelligence to Quaritch.  He also chronicles his experiences with the Na'vi through entries in a video diary.  Eventually he falls in love with Neytiri and the Na'vi, which undermines his loyalty to Quaritch and the RDA.  When he passes all the Na'vi tests, he is accepted into the clan, and he and Neytiri choose each other as life-long mates.  At that point, Jake's allegiance fully switches from the RDA to the Na'vi.

When Jake cannot convince the Na'vi to leave Hometree at the request of the RDA, which wants to mine the unobtainium at the site, Quaritch leads his forces into an attack on the Na'vi and Hometree.  The Na'vi are defeated, Hometree is destroyed, and Jake's secret deal with Quaritch is exposed to Neytiri and the clan.  Although Quaritch holds Jake and Grace prisoner, they manage to escape.  When Grace is mortally wounded in the ensuing shootout, the Na'vi try to save her by transferring her consciousness into her avatar body, but they are too late.  She dies.

Once again linked with his avatar, Jake regains the Na'vi's trust by taming a legendary flying dinosaur-like creature and rallies thousands of other Na'vi warriors from neighboring clans to fight Quaritch and Sec-Ops.  Jake leads the Na'vi into battle.  When it seems the Na'vi will be defeated, the Pandoran wildlife join the fight and overwhelm the Sec-Ops soldiers.  Jake and Neytiri enter a final battle against Quaritch, who dons a robotic suit.  In human form, Jake becomes exposed to deadly Pandoran air, and Neytiri kills Quaritch to save him.  In the final scene, Jake undergoes the same Na'vi ritual used

to try to save Grace, but this time it works—Jake's consciousness is permanently transferred into his avatar body and he leaves his human form behind.

Cameron originally conceived of the story in 1995 in a detailed 102-page "scriptment," which he describes as a "highly detailed script-length treatment that, like a treatment, was in a narrative rather than dialogue form, and laid out the story, characters, setting and many of the visual images for Avatar in great detail." Starting in 1996, Cameron circulated the scriptment to generate interest, and between 1995 and 1997, he began to explore the technology necessary to make Avatar. By 1997, however, he decided not to move forward with the film because the technology was not sufficiently developed. In 2005, Cameron decided the technology was available to make Avatar, so he revisited the project. Between December 2005 and May 2006, he wrote the first draft of the screenplay. Principal photography began in April 2007. Both before and during filming, Cameron rewrote and refined the screenplay, although he "always remained true to [his] original vision of Avatar as expressed in the scriptment."

## 2. *Ryder's KRZ*

Between 1996 and 1998, Ryder, a 3-D computer animator, wrote a science fiction short story entitled KRZ 2068 based on Joseph Conrad's classic story Heart of Darkness (1899). In 1998, Ryder and his wife created a business proposal surrounding KRZ to finance the project as a 3-D animated film for distribution via the Internet, television, or through DVD and video sales. As relevant here, the proposal had a "Notice to Recipients" that stated the proposal was being "delivered to a limited number of parties for informational purposes only. By your receipt of this document, you agree that (i) this Proposal and its contents are confidential; (ii) neither you, nor any person or entity with which you are associated, nor any of their . . . respective agents, representatives or employees will copy, reproduce, or distribute to others this Proposal, in whole or in part, at any time without the prior written consent of Channel Modus;[1] (iii) you and they will keep permanently confidential all information contained herein not already in the public

---

[1]     Ryder and his wife did business as "Channel Modus."

domain; and (iv) you and they will use this Proposal for the sole purpose for which it is intended and not in any manner detrimental to the interests of Channel Modus or the respective partners, advisors, or retainees."

In early 1999, Ryder sent the KRZ story and proposal to Andrew Wald, a movie producer and friend of his father-in-law. Wald believed KRZ had potential as a feature film and agreed to help Ryder get it made into a movie. In early 2000, Wald contacted a development executive at Lightstorm, Jay Sanders, about KRZ, and he, Ryder, Sanders, and another independent producer Toni Baffo met at the Lightstorm offices in February 2000. Wald provided Sanders a copy of the KRZ story, and, according to Ryder, the proposal.[2] At this meeting Sanders told Ryder "how unique and really cool he thought the KRZ story was, that it presented an excellent development opportunity for [Lightstorm], and that [Lightstorm] and [Ryder] should do this together and develop the KRZ project. [Ryder] agreed."

Although Sanders liked the story, he felt it needed to be refined. So between that initial meeting and either December 2000 (according to defendants) or December 2001 (according to Ryder), Ryder, Wald, and Baffo met with Sanders and Sanders gave them notes on the story and coached them on crafting a pitch that would appeal to his bosses, Rae Sanchini and Jon Landau. If Sanchini and Landau liked the story, they would present it to Cameron for final approval. During the development period, Ryder met with Sanders four times, while Wald and Baffo had additional meetings and calls with him. Sanders felt "passionate" about the project, devoting 30-40 hours to it while he was employed at Lightstorm. Ryder researched and compiled reference material relevant to

---

**2** Wald claimed he did not give Sanders the full proposal. Nor did Sanders recall receiving the proposal at any time. Ryder, however, claimed he saw Sanders with the full Velo-bound proposal he gave to Wald, and at the February 2000 meeting, Sanders mentioned specific items that were in the proposal but not in the KRZ story. In accord with summary judgment standards, we must credit Ryder's evidence and assume Sanders received the full KRZ proposal.

5

KRZ, including information on mining practices and environmental devastation, Jupiter and its moons, and strange and unique flora and fauna.

During this period Ryder continued to revise the KRZ story, and in mid-2000 Wald brought in screenwriter Stuart Hazeldine to write a treatment for KRZ on "spec" (i.e., without upfront payment, on speculation the project might later sell). After Hazeldine finished the treatment, Ryder, Wald, Baffo, and Hazeldine had a meeting with Sanders, Sanchini, and Landau, during which Hazeldine pitched KRZ to them. Cameron did not attend the pitch meeting. Lightstorm passed on the project. At no point did anyone at Lightstorm disclose the existence of the Avatar scriptment to Ryder.

Ryder, Wald, and Baffo continued developing and trying to sell KRZ. Sanders left Lightstorm in March 2001 and took his KRZ file with him. He joined Ryder, Wald, Hazeldine, and Baffo in seeking to sell KRZ elsewhere. Hazeldine wrote two drafts of a screenplay for KRZ, which the group submitted to various studios and directors without success. In 2004, Hazeldine retitled KRZ as The Adjuster and resubmitted it to Lightstorm, which again passed. Shortly after, Ryder and his group stopped pitching the project. Lightstorm's records indicate the submission entry for The Adjuster in Lightstorm's database was "[m]odified" in January 2006.

As set forth in the drafts of Ryder's short story and Hazeldine's later screenplays, KRZ takes place in the future mostly on Europa, an ice-covered moon of Jupiter. It tells the story of corporate assassin Kate Shepherd—named Marlowe in Ryder's short stories—who Ryder described in the KRZ proposal as a "strong, sexy, intelligent cyberbabe." She works for the Malloc super-corporation, which harvests organisms from ocean vents beneath Europa's icy surface. To do so, the corporation uses humans as well as organic-bionic hybrid robots called "KRY's," which have "Y's" on their foreheads and "limitation chips" that block emotions and free will. Kurtz, the foreman on Europa, is a robot called a "KRZ," which has a smaller limitation chip than KRY's and is self-aware and self-motivated.

The human base commander, Drew Welles, turns up dead in what appears to be an accident, so Malloc sends Shepherd to investigate. She travels to Europa with a KRY

named Kary and meets Kurtz, who knows she has come to investigate Welles's death. Kurtz and Shepherd tour the underwater harvesting fields and the surrounding exotic flora and fauna, and Kurtz tells Shepherd that Welles died in a harvesting accident. Kurtz allows Shepherd to experience his memories through a cord connected to a jack in the back of his head, and she learns Welles had become obsessed with increasing the organism yield from the ocean vents by using explosives that cause massive damage to the vents and KRY's. To stop him, Kurtz reprogrammed himself, killed Welles, and took over operations.[3]

Kurtz tells Shepherd he wanted to protect Europa from the devastating over-harvesting and urges her to cover up his murder of Welles. Instead, she reveals the murder to her Malloc supervisor Jeb Fulford. Fulford instructs her to kill Kurtz, but she fails. Kurtz lets her live, imploring her to join him in protecting the Europan ecosystem. She declines, but decides not to oppose his efforts.

Fulford arrives on Europa with a replacement crew of KRZ's. It is revealed Fulford conspired with Welles to use explosives in the mining process and now Fulford wants to replace all the humans with KRZ's. When Kurtz learns this, he rallies the humans to fight back. Kary, Shepherd's KRY companion, reveals he is a KRZ loyal to Malloc and Fulford, and reprograms some of the KRY's to create an army to fight Kurtz.

As the battle rages, Shepherd removes Kurtz's limitation chip, which allows him to feel the human emotions necessary to defeat Kary, but which will also kill him. Kurtz pursues and kills Kary, dying in the process. Meanwhile, Shepherd joins the battle against Fulford, who is threatening to freeze the humans to death by shutting down the nuclear reactor powering the base. She overtakes Fulford and forces him to tell Malloc she should be put in charge of operations. She gives him the opportunity to leave Europa,

---

[3]     The sensory technology varied throughout the KRZ story drafts—initially the sensory experiences are uploaded onto special data needles inserted into receptors in the back of a person's head; in later iterations the memories are experienced by cables plugged into a jack in the back of a person's head.

but he shoots at her, and the ricocheting bullets kill Fulford. In the end, Shepherd becomes the head of operations on Europa.[4]

### 3. Procedural Background

Ryder filed suit against defendants, alleging claims for (1) breach of fiduciary duty, (2) breach of express contract, (3) breach of implied contract, (4) promissory fraud, (5) fraud and deceit, and (6) negligent misrepresentation. Defendants moved for summary judgment. In a minute order, the trial court granted the motion on the ground that Cameron independently created Avatar. It later expanded that ruling by adopting defendants' proposed order, finding (1) Ryder failed to create an inference of use, (2) Cameron independently created Avatar, (3) there was no triable issue of fact as to the existence of a joint venture or express contract, and (4) there was no triable issue of fact as to fraud. The court also found a pending motion for discovery sanctions against defendants moot, given defendants produced the documents at issue and Ryder had the opportunity to review them and file a supplemental brief opposing summary judgment. Ryder timely appealed.

### DISCUSSION

### 1. Summary Judgment

#### A. Legal Standards

We review the grant of summary judgment de novo, considering all the evidence set forth in the moving and opposition papers except evidence for which objections were made and sustained. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) Under Code of Civil Procedure section 437c, subdivision (c), a motion for summary judgment must be granted if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, we must decide whether the defendant has conclusively negated a necessary

---

[4] The early drafts of Ryder's short stories focused more on Shepherd's journey to Europa than on the events there. Also, in early versions, Shepherd discovers Kurtz has gone insane, sending KRY's on suicide missions, staging fights between KRY's, and creating sculptures out of KRY and human body parts.

element of the plaintiff's claim or has established an affirmative defense and has demonstrated no material issue of fact requires a determination at trial. (Code Civ. Proc., § 437c, subd. (*o*); *Guz, supra*, at p. 334.) We review the trial court's evidentiary rulings for abuse of discretion. (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 852.) We may affirm on any ground supported by the record, and we are not bound by the trial court's reasoning. (*Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376.)

B. *Contract and Fiduciary Duty Claims*

On appeal, Ryder asserts a host of challenges to the trial court's grant of summary judgment on his contract and fiduciary duty claims. But each of these claims requires proof that defendants *used* his ideas for Avatar. (5 Nimmer & Nimmer, Copyright (2015) The Law of Ideas, § 19D.07[A], p. 19D-86 (rel. 72-4/2007) (*Nimmer*) ["Regardless of the legal theory used to impose an obligation on the idea-recipient, the recipient is legally obligated to pay only if the idea that the recipient used was the one actually received from plaintiff."]; *Hollywood Screentest of America, Inc. v. NBC Universal, Inc.* (2007) 151 Cal.App.4th 631, 649 [granting summary judgment on express and implied contract and breach of confidence claims because evidence of independent creation prevented the required element of use].) In the absence of direct evidence, "use" of an idea can be inferred from evidence showing the defendant had access to the plaintiff's idea and the parties' ideas are similar. (Nimmer, *supra*, § 19D.07[C], p. 19D-89; *Benay v. Warner Bros. Entertainment, Inc.* (9th Cir. 2010) 607 F.3d 620, 630 (*Benay*).) We need not address the issue of access because, as we shall explain, no rational jury could conclude the actionable elements in KRZ and Avatar were similar, which defeats an inference of use as a matter of law. (Cf. *Funky Films, Inc. v. Time Warner Entertainment Co., L.P.* (9th Cir. 2006) 462 F.3d 1072, 1081 (*Funky Films*) [For analogous copyright claims,

"'[n]o amount of proof of access will suffice to show copying if there are no similarities . . . .'"].)[5]

Before we compare the works, we must decide the *level* of actionable similarity necessary to raise an inference of use. For implied contract and fiduciary duty claims, the works must be *substantially* similar. (*Benay, supra*, 607 F.3d at p. 630 ["The requirement of substantial similarity for implied-in-fact contract claims 'aligns this field with copyright infringement . . . [and] also means that copying less than substantial material is non-actionable.'"]; *Spinner, supra*, 215 Cal.App.4th at p. 185; see *Fink v. Goodson-Todman Enterprises, Ltd.* (1970) 9 Cal.App.3d 996, 1010-1011 (*Fink*) [applying substantial similarity test to breach of confidence claim]; Nimmer, *supra*, The Law of Ideas, § 19D.08[A], p. 19D-97 ["In implied contract and confidential relationship cases, the weight of California authority is that there must be 'substantial similarity' between plaintiff's idea and defendant's production to render defendant liable."].) For an express contract claim, however, the level of similarity permitting an inference of use is keyed to the language of the parties' agreement. (*Benay, supra*, at p. 630; see *Weitzenkorn v. Lesser* (1953) 40 Cal.2d 778, 792; *Fink, supra*, at p. 1008.) For both types of claims, the material claimed to be similar need not be protectible under copyright law. (*Fink, supra*, at p. 1008.)

Ryder argues the terms of his KRZ proposal imposed a standard less than "substantial" similarity,[6] pointing to two clauses under the "Notice of Recipients" section: the term that Lightstorm would not "copy, reproduce, or distribute to others this Proposal, in whole or in part, at any time without the prior written consent of Channel Modus"; and the term that Lightstorm would "use this Proposal for the sole purpose for

---

5 We may rely on copyright cases because "[t]he framework for proving use in an idea submission claim is parallel to the framework for showing copying in a copyright claim." (*Spinner v. American Broadcasting Companies, Inc.* (2013) 215 Cal.App.4th 172, 186 (*Spinner*).)

6 For the sake of our decision here, we will assume Ryder's proposal created a binding contract with Lightstorm.

10

which it is intended and not in any manner detrimental to the interests of Channel Modus." Neither clause imposes a standard other than substantial similarity.

Ryder argues he incurred "detriment" when Sanders developed KRZ while concealing the existence of the Avatar scriptment, relying on expert testimony that standard industry practice should have prompted Lightstorm to disclose the existence of Avatar. But this evidence has nothing to do with whether defendants *used* elements of KRZ to his detriment. Instead, the prohibition against detrimental use presupposes there is enough similarity between elements in Avatar and KRZ to result in some conceivable harm to Ryder. That standard is consistent with substantial similarity.

Likewise, the clause preventing "copy[ing] . . . in whole or *in part*" (italics added) did not mean Lightstorm could not use *any* part of KRZ in Avatar, no matter how trivial or minor. This clause mirrors the touchstone inquiry of "copying" in copyright cases, which is circumstantially proved by access plus *substantial* similarity. (*Funky Films, supra*, 462 F.3d at p. 1076.) As noted, that standard parallels the inquiry of use in idea submission cases. (*Spinner, supra*, 215 Cal.App.4th at p. 186.) Thus, this clause also imposed a standard of substantial similarity. (Compare *Fink, supra*, 9 Cal.App.3d at p. 1010 [applying substantial similarity test to express oral agreement that defendants would pay plaintiff for any television program "based on" his submission].)[7]

Turning to the question of substantial similarity, Ryder points to a host of allegedly similar elements between Avatar and KRZ that were already present in

---

[7] While the court in *Fink* suggested the phrase "'based upon' does *seem* to be something a little different than having substantial similarity to a material element or qualitatively important part," it ultimately required a showing of substantial similarity. As Professor Nimmer explained, the court "ultimately decided that the difference between a 'based upon' test imposed by contract and the 'substantial similarity' test imposed by copyright law is simply that, in contract cases, plaintiff's material does not need to be protectible, whereas in copyright cases the subject expression does need to be protectible. Apart from that difference, the court concluded that 'essentially we have the same quest for the same points of similarity and the same analysis as to quantitative and qualitative factors . . . .'" (Nimmer, *supra*, The Law of Ideas, § 19D.08[B], p. 190-102, fn. omitted.)

Cameron's 1996 Avatar scriptment, as well as 12 elements that were added to the Avatar film. The preexisting elements in the Avatar scriptment are not actionable because defendants would not have "used" those same elements from Ryder's later-created KRZ. Thus, we "filter out" those preexisting elements in assessing the similarity of the works. (See *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp.* (6th Cir. 2004) 361 F.3d 312, 326 (*Murray*) [explaining in the context of copyright infringement, "Logic also supports the filtering of independently-created elements. The purpose of the substantial-similarity analysis is to answer the question whether the defendant copied the work of the plaintiff. Ordinarily, similar elements between known work of the plaintiff and the defendant's work will, depending on the degree of uniqueness and originality of the element, support such an inference. However, where defendant owns a prior work containing the same elements, he has no reason, beyond the illicit thrill of copyright infringement, to copy wrongfully from another what he could legally copy from himself. Therefore, where an element occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying can be drawn. [Citations.] Such elements should be removed from consideration."].)[8]

Ryder claims defendants are estopped from relying on the scriptment to filter out preexisting elements because defendants concealed the existence of the Avatar scriptment when Sanders claimed KRZ was "unique" and agreed to develop it. (Evid. Code, § 623 ["Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."].) Ryder's

---

[8]     Ryder argues *Murray* is inapplicable because it was a copyright case. While true, it is nevertheless useful (*Spinner, supra*, 215 Cal.App.4th at p. 186), and Ryder has provided no persuasive reason why the same common-sense "filtering" concept cannot apply to his idea submission claims. Ryder also attempts to factually distinguish *Murray*, but that case is strikingly similar: the defendant had a treatment for a film; the plaintiff submitted its screenplay to the defendant and the defendant passed on it; the defendant then created a screenplay and released a film expanded from the earlier treatment. (*Murray, supra*, 361 F.3d at pp. 314-315.)

12

argument fails because equitable estoppel "acts defensively only. It operates to prevent one from taking an unfair advantage of another but not to give an unfair advantage of one seeking to invoke the doctrine." (*Peskin v. Phinney* (1960) 182 Cal.App.2d 632, 636; see 13 Witkin, Summary of Cal. Law (10th ed. 2005) Equity, § 190, p. 527.) In other words, "the theory of estoppel is invoked as a defensive matter to prevent the party estopped from alleging or relying upon some fact or theory that would otherwise permit him to *recover* something from the party asserting estoppel." (*Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 555, italics added; see *In re Marriage of Umphrey* (1990) 218 Cal.App.3d 647, 658 [explaining estoppel "acts defensively only; it can never be used as [a] sword to gain unfair advantage by the one seeking to assert it"].) Here, Ryder improperly seeks to use the doctrine offensively to establish his contract claims by barring defendants from relying on the preexisting Avatar scriptment to undermine the inference of use. (See *Green, supra*, at p. 555 [refusing to apply estoppel to preclude defendant from relying on case law defeating plaintiff's claims].)

Ryder also contends, even if estoppel does not apply, Lightstorm expressly agreed not to use *preexisting* elements in the Avatar scriptment that were similar to elements in KRZ. Nothing in the record remotely supports such an expansive interpretation of the parties' alleged agreement. Contrary to the authority Ryder cites, this is not a case in which defendants *could have* come up with the common or unprotected ideas in KRZ but did not, thereby obligating them to pay Ryder for disclosing his ideas. (See, e.g., *Chandler v. Roach* (1957) 156 Cal.App.2d 435, 441-442 ["We believe that if a producer obligates himself to pay for the disclosure of an idea, whether it is for protectible or unprotectible material, *in return for a disclosure thereof* he should be compelled to hold to his promise. There is nothing unreasonable in the assumption that a producer would obligate himself to pay for the disclosure of an idea which he would otherwise be legally free to use, but which in fact, he would be *unable to use but for the disclosure*." (Italics added.)].) To confer rights on Ryder over the elements already created in the Avatar scriptment under these circumstances would turn idea submission law on its head.

13

Thus, Ryder can recover on his contract claims only if a rational jury could conclude the 12 elements Ryder argues were added to the Avatar film beyond the scriptment were substantially similar to elements in KRZ. As we will explain, these elements bear no substantial similarity, defeating any inference of use as a matter of law.[9]

*The protagonist is enlisted as a spy by the corporation.* Both protagonists are not acting as "spies." Jake in Avatar arguably becomes a "spy" when Quaritch enlists him to gather clandestine intelligence about the Na'vi. In KRZ, while at points Shepherd is called a spy for Malloc, she is not acting as a spy on Europa and her mission is always known—she has gone to investigate Welles's death. Further, the clandestine aspect of Jake's mission in Avatar is a significant plot point leading to Neytiri's rejection of Jake. In KRZ, because there is no clandestine aspect to Shepherd's Europa mission, her job description as a spy has no impact on the plot.

*The protagonist survives a life-threatening situation by escaping into a rushing torrent of water.* This element does not appear at all in KRZ. In Avatar, during Jake's first foray into the wilds of Pandora in his Na'vi avatar, he is attacked by a panther-like creature and escapes by jumping over a waterfall into a rushing river. In KRZ, Shepherd does not "escape" a dangerous situation by water at all. In Ryder's short story, she is sucked into a tube of water. In the KRZ screenplays, while submerged in the ocean, she blasts her way *into* an underwater elevator shaft and rides the resulting wave of water down to the base's nuclear reactor.

*The corporation depends on the spy to facilitate the continued mining.* Again, Jake and Shepherd are not both acting as spies. Nor does the corporation in KRZ rely on

___

**9** Ryder suggests the issue of substantial similarity must always go to the jury. Yet, the issue is frequently resolved as a matter of law if there is no substantial similarity between the works. (See *Klekas v. EMI Films, Inc.* (1984) 150 Cal.App.3d 1102, 1114 [summary judgment]; *Henried v. Four Star Television* (1968) 266 Cal.App.2d 435, 436-437 [demurrer]; *Sutton v. Walt Disney Productions* (1953) 118 Cal.App.2d 598, 603-604 [demurrer].) This parallels copyright law, in which the issue of substantial similarity is frequently resolved in the defendant's favor at summary judgment. (*Funky Films, supra*, 462 F.3d at p. 1077.)

Shepherd as a "spy" to facilitate the mining of the organisms on Europa. Because her intentions are known, the corporation simply relies on her to investigate Welles's death and get the mining operations back on track on Europa.

*The material is mined to great devastation to satisfy "quarterly" reports for the corporation on Earth.* The only alleged similarity for this element is that both works use the term "quarterly." Quarterly reports are common features of corporations, so they cannot constitute an actionable similarity. Further, the Avatar scriptment embodied the idea of devastating the natural world to satisfy corporate greed, and Selfridge mentions his next "report." That Selfridge refers to "quarterly" reports in the Avatar film is too insignificant to constitute an actionable similarity to KRZ's mention of quarterly quotas.

*The mining is managed using a large table-based light map.* This alleged element in the two stories is entirely different. In KRZ, an illuminated table map shows where Kurtz has mapped out Europan sea life. Avatar has no table-based map; instead, it incorporates a 3-D projected display showing mining areas.

*There is a mutiny between the top two corporate executives triggered by an escalation in explosive violence.* This element does not appear in KRZ or Avatar. In KRZ, Kurtz, the robotic foreman, kills Welles, the human base commander. Neither is a corporate executive. In a scene appearing in the Avatar shooting script but cut from the final film, Quaritch bullies Selfridge into approving an all-out attack on the Na'vi. Assuming Quaritch qualifies as a "corporate executive," he does not mutiny against Selfridge.

*The spy betrays the mission and leads a mutiny.* Again, Shepherd is not acting as a spy. Nor does anything in KRZ bear any similarity to Jake turning against Quaritch and the RDA and leading the indigenous Na'vi in an armed, violent attack against the RDA.

*Explosives are depicted as being used in the mining process.* The use of explosives related to mining is too obvious and insubstantial to be an actionable similarity. Nor are explosives depicted similarly in the two stories. In KRZ, explosives are planted inside ocean vents to increase the output of the organism to be harvested,

15

whereas in Avatar, explosives are used in the ordinary course of mining the unobtainium mineral.

*Mining explosives are later fashioned into a bomb to be used for non-mining purposes.* The use of explosives as weapons bears no resemblance in the two stories. In KRZ, some of the characters use small explosive charges stored on belts, whereas in Avatar, mining explosives are bundled onto large pallets that are then dropped from aircraft onto the Na'vi.

*The primary characters unilaterally "upload" information into video diaries, which can be viewed by others.* This element apparently refers to Shepherd using a smartphone-like device called a "Diary" to download information and send and receive messages. Nothing in Avatar resembles that element. Instead, Jake records himself in a traditional video log by sitting in front of a camera and describing his experiences.

*Whereas the scriptment is characterized by "exploration," Avatar the movie gains in conflict, suspense, and interest by changing its protagonist from a benign member of the scientific research mission to a corporate spy who—under cover of a benign mission—is in fact sent to infiltrate the inhabitants and further the mining operations, only to doublecross the corporation and join the lunar beings' insurrection.* Nothing like this occurs in KRZ. Again, Shepherd is not acting as a spy for the corporation sent to Europa under cover of a "benign mission." Nor was she sent to "infiltrate" the "inhabitants" of Europa, only to join the "lunar beings'" insurrection. Indeed, there are not even "inhabitants" on Europa like the indigenous Na'vi on Pandora. Instead, the "inhabitants" and "lunar beings" are KRY's and humans sent from Earth to harvest the organism in Europa's oceans, which bear no similarity whatsoever to the Na'vi.

*Totems made of body parts are depicted as having significant meaning.* The alleged "totems" are portrayed very differently in the two works. In early drafts of the KRZ story, Kurtz makes sculptures out of KRY and human body parts. In Avatar, a single giant skull from a Great Leonopteryx is revered by the Na'vi because the creature was ridden by the legendary "Toruk Macto."

Thus, because the 12 elements Ryder claims were added to the Avatar film beyond the scriptment were not substantially similar to elements in KRZ as a matter of law, the trial court properly granted summary judgment on Ryder's contract and fiduciary duty claims.

## C. Fraud Claims

Ryder's fraud claims are based on allegations that Sanders, on behalf of Lightstorm, accepted KRZ for development, telling him KRZ was "unique" and an attractive film opportunity. At the same time, Lightstorm, through Sanders, did not disclose the "fully developed scriptment" for Avatar that was "substantially similar to KRZ, and that [Lightstorm] fully intended to prepare *Avatar* for film production." Ryder alleged Lightstorm concealed the Avatar scriptment because it "intended to secretly share KRZ and Ryder's submissions with James Cameron for the purpose of surreptitiously assisting Cameron's continuing development" of Avatar. It also sought to induce Ryder "to take KRZ off the market by giving Ryder information about [Lightstorm's] supposed good faith intentions and its interest in the unique KRZ project."[10]

To prove fraud, a plaintiff must present evidence of "'"(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage."'" (*Behnke v. State Farm General Ins. Co.* (2011) 196 Cal.App.4th 1443, 1452-1453.) Promissory fraud is a species of fraud requiring proof of "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5)

---

**10** Ryder also alleged, in early 2002, Lightstorm falsely stated "it was not interested in producing an environmentally themed feature length 3-D science fiction movie" like KRZ because it "would not be marketable and accepted by the movie-going public." In his declaration, Ryder testified that "Wald told me that he had heard from [Lightstorm] that [it] had determined that no one would go to see an environmentally themed 3D science fiction movie." The trial court properly sustained defendants' double hearsay objection to this testimony and excluded it.

17

nonperformance by the party making the promise; and (6) resulting damage to the promise[e]." (*Id.* at p. 1453.)

Ryder offered no evidence supporting an inference defendants made any intentional misrepresentations or false promises. For Sanders, there was no evidence his interest in KRZ was anything but genuine. In fact, Sanders believed so strongly in KRZ that when he left Lightstorm in March 2001 he took the KRZ file with him and joined Ryder, Wald, Hazeldine, and Baffo in seeking to sell KRZ elsewhere. It defies logic that he would have continued to pursue KRZ after leaving Lightstorm if he had been misrepresenting Lightstorm's interest in KRZ simply to either feed ideas from KRZ to Cameron for use in Avatar years later or keep KRZ off the market while Avatar was dormant. As for Sanchini and Landau, there was no evidence they were *ever* interested in developing KRZ, let alone using KRZ either to obtain ideas for Cameron for Avatar or to remove KRZ from the market. At most, there was evidence suggesting Landau, Sanchini, and others attended weekly meetings when KRZ was on the agenda and knew Sanders was enthusiastic about the project. But when Ryder and his group officially pitched KRZ to Sanchini and Landau in 2001 (according to Ryder), they passed on it.

Ryder has also failed to offer any evidence of resulting harm. Even if defendants concealed their use of the KRZ development process to obtain ideas for Avatar, defendants never actually *used* any of those ideas because, as we outlined above, the elements added to the Avatar film beyond the scriptment were not substantially similar to any elements in KRZ. Likewise, even if defendants sought to keep KRZ out of the market between 2000 and 2001, Ryder offered no evidence he could have sold KRZ elsewhere or otherwise missed any other development opportunities during that time. Indeed, the undisputed evidence showed Sanders, Wald, Baffo, and Ryder unsuccessfully attempted to sell KRZ for years after Lightstorm passed but before Avatar was released, including by resubmitting it to Lightstorm, which again passed.

18

Thus, summary judgment was proper on Ryder's fraud claims.[11]

## 2. *Motion for Sanctions*

Prior to the hearing on defendants' summary judgment motion, Ryder filed a motion for discovery sanctions based on defendants' failure to produce documents as previously ordered by the court. At a status conference, the court stated it was tentatively inclined to grant the motion. In response, defendants produced more than 19,000 pages of documents. By that point, defendants' motion for summary judgment was pending, so the court continued the hearing and ordered the parties to file supplemental summary judgment briefing addressing the new documents. The parties did so. The trial court thereafter found the motion for sanctions moot because Ryder had the opportunity to brief the newly produced documents and suffered no prejudice.

We affirm the court's ruling, but for a different reason—the motion remains moot because it implicated the issue of access and we have affirmed summary judgment on the lack of similarity as a matter of law. Ryder argued to the trial court and again on appeal that the newly produced documents shed light on the issue of Cameron's indirect access to KRZ through the involvement of Landau, Sanchini, and others in the Avatar development process. On appeal, he claims he was prejudiced because he was unable to

---

**11** Ryder has not separately addressed his negligent misrepresentation claim on appeal. Thus, the claim is abandoned. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1177 ["[F]ailure to address summary adjudication of a claim on appeal constitutes abandonment of that claim."].) In any case, summary judgment was proper on this claim because he offered no evidence of a *negligent* representation. Ryder's misrepresentation theory was premised on defendants' *intentional* concealment of and misrepresentations about the Avatar scriptment. That is inconsistent with proving defendants ""''"honestly believ[ed] that [the representations] are true, but without reasonable ground for such belief.""''" (*Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 781 ["[T]he allegations of misrepresentation contain the element of intent, and knowledge that the information was inaccurate. As such, the allegations are inconsistent with the requirements for a cause of action for negligent misrepresentation."].) Ryder also has not addressed the trial court's grant of summary judgment on fraudulent concealment, or on his fraud claims against Cameron individually. Those claims are also abandoned.

use those documents in depositions to explore that issue. These contentions do not implicate the issue of similarity, which is independent of access. Thus, even if Ryder were permitted to depose witnesses with the new documents, it would not change the outcome of this appeal. (Cf. *Funky Films, supra*, 462 F.3d at pp. 1081-1082 [denying plaintiff's request to take additional discovery on access because summary judgment was proper on lack of substantial similarity].)

## DISPOSITION

The judgment is affirmed. Respondents shall recover costs on appeal.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.

Filed 4/22/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| ERIC RYDER,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LIGHTSTORM ENTERTAINMENT, INC., et al.,<br><br>    Defendants and Respondents. | B254922<br><br>(Los Angeles County<br>Super. Ct. No. BC474876)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:[*]

    The opinion in the above-entitled matter filed on March 25, 2016, was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

---

[*]    BIGELOW, P. J.          FLIER, J.          GRIMES, J.

21