Filed 3/6/23  Clean Up America v. City of L.A. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| CLEAN UP AMERICA, INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LOS ANGELES, <br><br> Defendant and Respondent. | B308572 <br><br> Los Angeles County <br> Super. Ct. No. 18STCV04176 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly J. Fujie, Judge.  Affirmed.

Law Office of Gronemeier & Hickambottom, Dale L. Gronemeier and Elbie J. Hickambottom, Jr., for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Scott Marcus, Chief Assistant City Attorney, Blithe S. Bock, Managing Assistant City Attorney and Sara Ugaz, Deputy City Attorney, for Defendant and Respondent.

—————————————

Appellant Clean up America, Inc. (CUA) is a licensed construction and demolition waste hauler/processor. It is a disadvantaged business enterprise (DBE) because its majority owner, appellant Deontay Potter, is African-American.

Appellants (CUA collectively) entered into a contract with respondent City of Los Angeles (City) to collect, haul away, and recycle construction debris. The City stopped sending CUA projects under the contract when it learned CUA had violated state and local laws designed to protect public safety and the environment and had failed to correct the violations. CUA then filed a civil action against the City alleging racial discrimination and denial of equal protection in violation of Article I, sections 7 and 8 of the California Constitution. The trial court granted summary judgment in favor of the City and against appellants. We affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

I.  ***The Allegations of the Second Amended Complaint***

On August 19, 2019, CUA filed it operative second amended complaint (SAC) against the City. In August 2013, CUA was the winning bid on a request for proposal issued by the City for collecting, hauling, and recycling construction debris. In January 2015, CUA was awarded a Department of General Services contract, effective December 2015. In March 2015, a City employee, Martina White, told Potter that "higher-ups" within the City, specifically one Kelly Cooper, did not want CUA to be awarded the contract. CUA understood this to mean it was not welcome because Potter was African-American.

Thereafter, City staff allegedly administered the contract to CUA's detriment, applying arbitrary standards to CUA that were not applied to other trash contractors which were not African-

2

American or Black owned and operated.  In particular, the City "unreasonably scrutinized CUA's performance of its contractual obligations, particularly concerning the submission of dump tickets and recycling reports."  The City would "often delay and/or deny payment of CUA's invoices based on a strict requirement regarding the submission of the said dump tickets and recycling reports as well as a number of other minor issues."  Even after CUA made requested additions or edits to its submissions for payment, the City would unreasonably delay its review and approval of the invoices and related submissions.  The unreasonable delays or denial of payment "resulted in extreme financial burden on CUA.  This affected CUA's ability to maintain optimal labor force necessary to perform the task of manually sorting and recycling tons of construction debris. Additionally, the amount of administrative time that CUA staff had to devote to follow-up responses to its invoices and concomitant documentation, i.e., recycling reports and dump tickets, adversely impacted its ability to perform core operations of the business."

On May 16, 2016, 16 months after awarding the contract to CUA, the City allegedly rescinded the contract and replaced CUA with Arrow Disposal Services.  CUA learned later that Arrow had been found to be "directly flouting the rules and regulations" for handling construction debris, was given a "meaningless $1,000.00 fine[,] and allowed to keep operating."  In addition, in February 2017 the City audited the hauling records of Arrow and discovered it had failed to submit required recycle reports from January 2014 through December 2016 and had grossly underrepresented the amount of waste it had hauled to avoid payment of taxes.  Further it had dumped waste in county

landfills instead of at certified recycling centers. Despite this and other violations, Arrow was promptly paid its invoices.

When CUA spoke to the City about payment delays, Martina White told them to contact "Auntie Maxine," referring to Congresswoman Maxine Waters "who is a well known champion of racial equality and the fight against discrimination." CUA understood this to mean that the City harbored racial resentment against it. Finally, as evidence of the City's racial bias against it, CUA alleged that in a separate civil dispute between CUA and Arrow Disposal Services, Kirk Tahmizian, Arrow's owner, "referred to Potter as a nigger."

The SAC alleged the City harbored racial animus toward CUA, the only black-owned certified construction debris contractor in the City of Los Angeles, as evidenced by 1) Martina White's advice to see "Auntie Maxine" and her revelation that the "higher-ups" in the City did not want CUA to have the trash debris contract; 2) the fact that the City did business with Arrow, whose owner Kirk Tahmizian was openly racist; 3) the imposition of more onerous performance standards on CUA and not on non-black-owned contractors and the delays in payment until such standards were fulfilled; and 4) the imposition of these standards, knowing they increased operating costs for CUA and ultimately resulted in loss of its certification because it could no longer afford to process the construction debris hauled to its facilities.

In sum, the SAC pled that a discriminatory animus existed based on the comments of Martina White about the City "higher-ups" and "Auntie Maxine," the obstacles appellants encountered in securing payment for invoices compared to their peers, and the rescission of the contract with respect to appellants despite similar behavior by Arrow. The SAC alleged there was a causal

link between the discriminatory animus and the rescission of the contract and the replacement of CUA with Arrow.

## II. *Summary Judgment Proceedings*

On January 24, 2020, the City filed a motion for summary judgment. It was accompanied by a separate statement of undisputed facts and four declarations with attached exhibits. The City countered the allegations of the SAC with these undisputed material facts.

### A. The Initial Contract With CUA

In 2013 CUA was awarded a construction debris disposal contract, which took effect on December 9, 2015. During the relevant time period, CUA operated its own processing facility for the construction debris it hauled. The contract required CUA to observe and comply with all Federal, State, and local laws which in any manner affecting those engaged or employed on the work, the material of the work or the conduct of the work. CUA was required to obtain and pay for all permits necessary for the performance of the work; CUA agreed that payments would be withheld absent its compliance with LA City business tax requirements. The city had sole discretion to terminate the contract for any reason or no reason at all without cause.

### B. Violations of State and Local Law

The City presented the testimony of Environmental Affairs Officer David Thompson, who serves as program manager for the City's Local Enforcement Agency (LEA) which inspects all solid waste facilities to make sure they are properly established, operated, and managed in a manner that protects public health and the environment. Before winning the hauling and disposal bid in 2013, CUA had operated a registered and solid waste

5

processing facility since 2012. Such facilities are inspected monthly. During 2014 and from January through June 2015, monthly inspections discovered violations. In particular the July 14, 2015, inspection documented two areas of concern: the amount of debris stored at CUA's facility and the stability of the piles of stored debris. In August 2015, the monthly inspection documented unprocessed storage of debris and unstable debris piles. CUA submitted an Action Plan to reduce the amount of debris at its processing facility and to hire additional staff to function as a second shift. In September 2015 the monthly inspection documented continued violations. In October 2015, there were again documented violations demonstrating CUA's ongoing failure to address previously identified violations and compliance issues. In November 2015, the violations had not been addressed through the Action Plan. On December 15, 2015, shortly after the contract became effective, the monthly inspection again documented continuing violations and noncompliance with the August 2015 Action Plan. The City issued a formal Notice and Order dated December 22, 2015. On February12, 2016, CUA and the LEA entered into a stipulated agreement for compliance with state minimum standards. CUA stipulated that the facility was in violation of applicable regulations. From March 2016 through October 2016, the City inspected the processing facility and contemplated issuing a cease and desist order so that CUA would not be able to bring waste to the facility until the violations were corrected. Eventually a fire ignited spontaneously in the unstable pile of debris at CUA's processing facility. It smoldered for six weeks while City firefighters tried to extinguish it safely without bringing down the pile itself. In October 2016, the City served a

6

cease and desist order recounting the history of inspections and violations culminating with the December 22, 2015 Notice and Order. The October 2016 Cease and Desist order called on CUA to immediately stop accepting incoming material and pay an administrative penalty of $840,000 to the City for 168 days of violating the stipulated agreement between March 16, 2016 and August 31, 2016.

Thus, before the effective date of the hauling and disposal contract, the City had been inspecting CUA's debris processing facilities and discovered numerous regulatory violations that needed to be corrected. After the contract took effect, and after notice to CUA to resolve the violations, the City issued a cease and desist order which prevented CUA from taking debris it had collected to its own processing facilities.

On top of what was happening at the processing facility, CUA committed a contractual violation with its very first project when it delivered bins to a City worksite that were damaged and already partially filled with debris from another project. Had the error not been caught, the City would have been overcharged for construction waste it had not generated.

C.    Payments

The contract became effective on December 9, 2015. Standard payment terms were net 30 days. During the period January 2016 through November 2016, CUA invoiced the City for 73 debris hauls, for a total amount paid to CUA of $22,320.51. Although the City continued to find violations, it issued its first notice to proceed under the contract on December 17, 2015. CUA submitted its first invoices on January 20, 2016. The City paid the invoices in full on February 18, 2016.

7

Martina White, the City analyst managing CUA's contract, became concerned that CUA's performance did not improve over time after the delivery of the first partially filled bins. She determined to engage a second waste hauler, Arrow Disposal, to ensure that the construction waste was timely hauled away and disposed of properly. Arrow was engaged in April 2016 to provide hauling services alongside CUA. It was the normal practice to contract with more than one construction waste hauler at any given time. CUA continued to receive hauling projects up through August 2016.

Before it would pay invoices, the City required all debris haulers, including CUA and Arrow, to provide receipts (or dump tickets) for dumps of debris loads larger than six tons. Debris loads in excess of six tons required receipts because debris haulers were paid a flat fee for the first six tons and charged an excess fee for the weight above six tons. The City Controller's office would not process an invoice for payment without a receipt confirming the weight of debris in excess of six tons. Most of CUA's invoices were paid within 30 days. Those invoices paid after 30 days were paid within 60 days except the last invoice submitted in August 2016, which was paid in November 2016. White reviewed all payments to Arrow and to CUA and determined that none were unreasonably delayed. She prepared spreadsheets showing CUA and Arrow's payments, which followed the same timeline, that is, between 30 and 60 days after date of submission.

D. Continuing Violations

Because CUA was not remedying the continuing violations found during the monthly inspections, CUA and the City entered

8

into a stipulated compliance agreement on February 12, 2016 by which CUA admitted its regulatory violations.

Work continued. By March, CUA was in violation of the stipulated agreement and the City notified CUA that it could not accept incoming trash debris until its processing facility achieved full compliance. By June 2016, City inspectors recommended that CUA cease accepting incoming debris into its processing facility. In August 2016, CUA submitted its last payment invoice. In October 2016, the City issued a cease and desist order because of continuing violations of state minimum standards at the processing facility and fined CUA $840,000 for violating the stipulated agreement between March 16, 2016 and August 31, 2016.

After April 2016, both CUA and Arrow were assigned trash hauling duties. Each was required to submit a fiscal year-end recycle report to the City's Department of Sanitation. Failure to submit the report did not constitute cause to withhold any payment due to a vendor. CUA submitted the year end report for 2015. Arrow submitted recycle reports for fiscal years 2017 and 2018.

### E.     Facts of Alleged Racial Bias

The third-party vendor who made the overtly racist remark about Potter was not an employee of the City. Martina White also submitted a declaration stating that when she told Potter to contact "Auntie Maxine," she saw CUA struggling to comply with the contract. She knew Congresswoman Waters was aware of government grants that assisted black-owned businesses which, like CUA, appeared to need help. That was the sole reason she referred CUA to Congresswoman Waters. White declared she

9

had not observed racial animus toward CUA by any supervisors she worked with.

F.    Facts Presented in Response to Motion for Summary Judgment

In opposition to the City's motion, appellants presented the Declaration of Deontay Potter, which set out these facts.

1.    CUA was awarded the contract in 2013, but it did not go into effect until December 2015. A two-year waiting period in his experience is not customary.

2.    City employee Martina White told him in 2015 that the "higher ups" did not want the contract awarded to CUA.

3.    After a minor issue that was brought to his attention early on in the contract period, there were no significant or material issues with CUA's performance under the contract in that CUA never received any write up or documented notice of breach or non-performance.

4.    In April 2016, the City contracted with Arrow on a second contract. CUA still remained the primary vendor between the two companies. Arrow's pricing was higher than CUA's pricing.

5.    As primary vendor, CUA had the right of first refusal of construction debris hauling jobs, yet the vast majority of all construction debris hauling jobs that arose went to Arrow after April 2016.

6.    After April 25, 2016, 52 requests for service were directed to Arrow and 6 were directed to CUA. None of the 52 requests were offered to CUA first as the primary vendor. The 52 requests handled by Arrow

10

cost 50 percent more than they would have had CUA performed them.

7. In June 2016, the City demanded specific recycle reports and did not pay CUA's final August 2016 invoice until November 2016. It delayed processing the final invoice while it required the recycle reports documents and information.

8. Arrow was not required to, and did not, submit recycle reports for work performed in 2016.

9. For the periods of May 1 through May 31, 2016, and August 11 through August 30 2016, Arrow illegally dumped 10 loads of construction debris waste and was fined $1,000 for only one violation instead of the "appropriate amount" of $43,000.

10. The City's failure to appropriately fine Arrow was a blatant act of discriminatory treatment. Its intentional exemption of Arrow from submitting recycle reports for 2016 was to facilitate a competitive advantage for Arrow.

11. The City eventually did a full audit of Arrow for the period of services rendered from January 1, 2014 through December 31 2016 and discovered it had unlawfully disposed of thousands of tons of constructive debris waste and yet it was fined a mere $1,000. It also owed over $500,000 in unpaid fees for underreported waste it hauled and revenues it generated. It was allowed to pay the outstanding fees over time.

12. Martina White's testimony is not creditable because she was caught in a lie at her deposition.

11

G.    The Grant of Summary Judgment

The trial court granted summary judgment in favor of respondent City and against CUA. In doing so, the trial court found "Plaintiffs have conceded to the arguments of Moving Defendant. The legal analysis section of Plaintiffs' opposition is void of any citations to legal authority. . . . Plaintiffs' opposition also fails to cite to any evidence." The trial court noted that plaintiffs cited to only one case, *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, for the proposition that the evidence plaintiffs presented in opposition to the summary judgment motion shifted the burden of proof to the City, a burden plaintiffs contended the City did not adequately shoulder. The trial court found plaintiffs provided no legal analysis demonstrating why *McDonnell Douglas*, a Title VII action involving an employee and private employer, applied to racial discrimination allegations in the context of a contract between a private vendor and a government entity. Finding plaintiffs' opposition provided "no reasoned rebuttal argument to the arguments advanced" by the City, the trial court concluded CUA had conceded the City's arguments and granted summary judgment in favor of the City. This appeal followed.

**DISCUSSION**

Appellants Failed to Raise a Triable Issue of Material Fact in Opposition to Summary Judgment and the City Showed It Was Entitled to Judgment as a Matter of Law.

I.    ***Standard of Review***

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to

12

judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850. (*Aguilar*).) "[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*)

When the moving party is a defendant, it must show that the plaintiff cannot establish at least one element of the cause of action. (*Aguilar, supra*, 25 Cal.4th at p. 853.) "The defendant has shown that the plaintiff cannot establish at least one element of the cause of action by showing that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Id.* at p. 854.) The defendant must "present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Ibid.*, fn. omitted.) Thus, "the defendant *must* 'support[]' the 'motion' with evidence including 'affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice' must or may 'be taken.' (Code Civ. Proc., § 437c, subd. (b).) The defendant may, but need not, present evidence that conclusively negates an element of the plaintiff's cause of action. The defendant may also present evidence that the plaintiff does not possess, and cannot reasonably obtain, needed evidence—as through admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing." (*Aguilar*, at p. 855.)

"Supporting and opposing affidavits or declarations. . .shall set forth admissible evidence." (Code Civ. Proc., § 437c, subd. (d).) "Matters which would be excluded under the rules of

13

evidence if proffered by a witness in a trial as hearsay, conclusions or impermissible opinion, must the disregarded in supporting affidavits." (*Hayman v. Block* (1986) 176 Cal.App.3d 629, 639.)

Ordinarily, we review a trial court's rule on evidentiary objections for an abuse of discretion. There is a split of authority on evidentiary objections made in connection with a motion for summary judgment, however. The Sixth District Court of Appeal, and to a more limited degree the First District Court of Appeal, have held that some or all written evidentiary objections should be reviewed *de novo*. (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1450–1451; *Strobel v. Johnson & Johnson* (2021) 70 Cal.App.5th 796, 816–817.) We agree with the majority of courts which have held that the abuse of discretion standard applies.[1]

---

[1] See, e.g., *Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1118; *Butte Fire Cases* (2018) 24 Cal.App.5th 1150, 1169; *Duarte v. Pacific Specialty Ins. Co.* (2017) 13 Cal.App.5th 45, 52; *O'Neal v. Stanislaus County Employees' Retirement Assn.* (2017) 8 Cal.App.5th 1184, 1198–1199; *Ryder v. Lightstorm Entertainment, Inc.* (2016) 246 Cal.App.4th 1064, 1072; *Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 951; *Serri v. Santa Clara University.* (2014) 226 Cal.App.4th 830, 852; *Ahn v. Kumho Tire U.S.A., Inc.* (2014) 223 Cal.App.4th 133, 143–144; *Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181; cf. *Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1122–1123 (conc. opn. of Turner, P. J.) (*Howard*) [listing 13 decisions and stating the "unanimous" decisions from 2006 to 2012 apply abuse of discretion standard].

II.  ***Applicable Law***

Article I, Section 7, of the California Constitution states "[a] person may not be deprived of life, liberty, or property without due process of law." (Cal. Const., art. I, §7, subd. (a).) This does not protect all conceivable property interests but instead only those property interests or benefits that are conferred by statute. (*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94 Cal.App.4th 1048, 1071; *Schultz v. Regents of University of California* (1984) 160 Cal.App.3d 768, 786.)  For its part, Article I, section 8 states "[a] person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin." (Cal. Const., art. I, §8.)  If CUA's cause of action for racial discrimination and equal protection violations is considered a disparate treatment claim, the elements of such a claim, expressed in an employer-employee context are: 1) the employee's membership in a classification protected by the statute; 2) discriminatory animus on the part of the employer toward members of that classification; 3) an action by the employer adverse to the employee's interests; 4) a causal link between the discriminatory animus and the adverse action; 5) damage to the employee; and 6) a causal link between the adverse action and the damage. (*McCaskey v. California State Auto. Assn.* (2010) 189 Cal.App.4th 947, 979; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 360.)

"Unequal treatment which results simply from laxity of enforcement or which reflects a nonarbitrary basis for selective enforcement of a statute does not deny equal protection and is not constitutionally prohibited discriminatory enforcement."

(*Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 832.) Unequal application of a statute or rule to persons entitled to be treated alike is not a denial of equal protection "unless there is shown to be present in it an element of intentional or purposeful discrimination." (*Snowden v. Hughes* (1944) 321 U.S. 1, 8.) What the equal protection guarantee prohibits is state officials "purposefully and intentionally singling out individuals for disparate treatment on an invidiously discriminatory basis." (*Murgia v. Municipal Court* (1975) 15 Cal.3d 286, 297.)

III.   *Analysis*

We agree with the trial court that CUA did not properly rebut the evidence presented by the City and create a triable issue of material fact. CUA did not refute the City's nondiscriminatory reasons to stop assigning hauling and recycling projects exclusively to CUA. CUA did not deny the regulatory and statutory violations it committed with respect to its waste processing plant. CUA did not dispute the issuance of a cease and desist order which prohibited it from using its own facilities to process the construction debris it had contracted to haul away and recycle under the contract. CUA did not dispute that the City had a right to contract with a secondary vendor in addition to CUA to haul and dispose of construction debris. CUA did not dispute that the City paid all invoices except the last one within 30 to 60 days of submission. (*DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 566 ["By failing to argue the contrary, plaintiffs concede this issue"].)

16

Significantly CUA did not dispute Martina White's nondiscriminatory reason for referring CUA to Congresswoman Waters except to accuse White of lying. It also relied solely on its own "understanding" that when White said the "higher-ups" did not want CUA to win the contract, White was referring to racial bias by City officials. And it inexplicably imputed to the City the racial bias demonstrated by one of the City's third party vendors.

In sum, where the City refuted the unsubstantiated allegations of the SAC, CUA did not offer anything other than Potter's personal opinions, perceptions and understandings, from which not even an inference arises that the City's decisions were actually made on the prohibited basis of race. (*Serri v. Santa Clara University*, *supra*, 226 Cal.App.4th at p. 862 [" 'substantial responsive evidence' " must be produced demonstrating the existence of a material triable controversy as to pretext or discriminatory animus].)[2] Assuming, as CUA contends, that the *McDonnell Douglas* burden-shifting analysis applies in this contractual context, we find the City adequately shifted the burden of producing evidence when it put forward non-discriminatory reasons for declining to assign more waste hauling projects to CUA. When the burden then shifted to CUA, it failed to rebut the City's evidence with non-speculative evidence of its own.

---

[2] Even if we considered the evidence CUA offered which the trial court ruled inadmissible, our conclusion would not change.

## DISPOSITION

The judgment is affirmed.  Respondent City of Los Angeles shall recover costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                        STRATTON, P. J.

We concur:



        WILEY, J.



        HARUTUNIAN, J.*

---

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.