Filed 7/28/16  Olympic and Georgia Partners v. Arch Specialty Ins. Co. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| OLYMPIC AND GEORGIA PARTNERS LLC, | B264647 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC488313) |
| v. | |
| ARCH SPECIALTY INSURANCE COMPANY et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. William F. Highberger, Judge.  Affirmed.

Scott W. Sonne, for Plaintiff and Appellant.

Horvitz & Levy, Peter Abrahams and Mitchell C. Tilner; Hinshaw & Culbertson, Kent Keller and Larry M. Golub, for Defendants and Respondents Arch Specialty Insurance Company, Lexington Insurance Company, Princeton Excess & Surplus Lines Insurance Company, Crawford & Company, and James Whipple.

Cummins & White, Larry M. Arnold, Margaret R. Miglietta and Annabelle M. Harris, for Defendants and Respondents Continental Casualty Company, Endurance American Special Insurance Company, Great Lakes Reinsurance (UK) PLC, and XL Insurance America.

* * * * * *

The company that owned and developed a high-rise hotel and condominium in downtown Los Angeles obtained builder's risk insurance policies that protected against "all risks of direct physical loss or damage" subject to certain exclusions. The company hired subcontractors to install the stone flooring in the condos, and those subcontractors used varying depths of mortar beneath the stone to ensure that the floor was level. The drying mortar shrank, and where it was applied more thickly, it caused tiny fractures in the stone. The company filed a claim with the consortium of insurers who issued the builder's risk policies for the cost of removing and replacing the flooring. The consortium denied the claim, chiefly because the policies excluded the "[c]ost of making good faulty or defective workmanship" and the "[c]ost of making good fault, defect, error, deficiency or omission in design, plan or specification." The company sued the individual insurers in the consortium for breach of contract and bad faith denial of coverage, and sued the insurers, the consortium's independent investigator and the individual claims adjuster assigned to the claim for fraud. The trial court granted summary judgment against the company on all of its claims. Concluding there was no error, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *The project*

Plaintiff Olympic and Georgia Partners LLC (the LLC) developed and built a 54-story high rise as part of the L.A. Live! mixed-used complex in downtown Los Angeles. The high rise was to be constructed, completed and occupied in three phases, with a Marriott hotel on its bottom floors, a Ritz-Carlton hotel in its middle floors, and 212 Ritz-Carlton luxury condominiums on its upper floors. The LLC hired Webcor as its general contractor, and Webcor hired two subcontractors to install the stone flooring in the condos—J. Colavin & Son and SMG/AGI Stone Company. The two subcontractors divided up the flooring work by room, with each fully installing the flooring in the rooms in which it was assigned to do the work.

2

### B. *Acquisition and terms of builder's risk insurance*

In 2007, as construction commenced, the LLC hired Marsh USA, Inc. (Marsh) as its insurance broker and risk management advisor. With the help of Marsh broker Jenni Ashby (Ashby), the LLC obtained builder's risk policies from a consortium of eight different insurance companies, each of which agreed to a certain percentage of the overall coverage: Defendant Lexington Insurance Company agreed to cover 45 percent, and six other insurers whom the LLC sued (collectively, the insurance companies)—defendants Princeton Excess & Surplus Lines Insurance Company, Endurance American Specialty Insurance Company, Great Lakes Reinsurance (UK) PLC (Great Lakes), XL Insurance America, Arch Specialty Insurance Company (Arch), and Continental Casualty Company (Continental)—each covered 10 percent or less.[1]

Each insurance company issued its own policy, but the language in those policies was largely the same. Every policy was an "all risk" policy—that is, it insured "all risks of direct physical loss of or damage to insured property" during construction, subject to several enumerated exclusions. Every policy had the following two exclusions from coverage: (1) Exclusion B, which excluded from coverage the "[c]ost of making good faulty or defective workmanship or material, *unless direct physical loss or damage by an insured peril ensues and then this policy will cover for such ensuing loss or damage only*"; and (2) Exclusion C, which excluded from coverage the "[c]ost of making good fault, defect, error, deficiency or omission in design, plan or specification, *unless direct physical loss or damage by an insured peril ensues and then this policy will cover for such ensuing loss or damage only*." (Italics added.) The italicized portion of each exclusion is called an "ensuing loss" clause.

Every policy stated that it was effective from August 1, 2007 until August 1, 2010. However, every policy also provided that "coverage will cease" prior to August 1, 2010, upon "the placing of the Insured Property or any part of the Insured Project into

---

[1] An eighth insurer, Landmark American Insurance Company, also covered a small percentage but was dismissed from this case.

commercial service for its intended purpose." Two of the policies added qualifications to this early expiration provision: The Arch policy further stated that "[o]ccupancy occurs when [the] insured project is put to its intended use, however, only as respects that portion or portions put to that use," and the Great Lakes policy further stated that occupancy of "any completed or partially completed portion . . . shall not" for 90 days "reduce[]" "the coverage of [that] policy." All of the policies also required 90 days written notice before they could be "cancelled."

On behalf of Marsh, Ashby sent the LLC copies of these policies as well as summaries of their provisions.

### C.     *Opening of Marriott hotel and the LLC's purchase of property insurance*

In December 2009, Ashby e-mailed Michael Murkey (Murkey), who was the Director of Risk Management for one of the two entities that owned the LLC. Because the Marriott hotel was expected to open in February 2010, Ashby informed Murkey that the LLC "need[ed] to know NOW who is responsible for the insurance going forward and need[ed] to get values ASAP." Shortly thereafter, Murkey responded that he had obtained approval "to proceed with the marketing of the [permanent] property insurance" for the high rise. Ashby and Murkey then worked together to compile the necessary information about the property, and Ashby obtained proposals for permanent property insurance to be in place by the scheduled Marriott hotel opening date of February 14, 2010.

In early February 2010, Murkey asked Ashby whether the builder's risk policies could be continued in force as to the unfinished portions of the high rise after the Marriott opened; Ashby "said she would check on it." On February 5, 2010, Ashby responded with an e-mail indicating that "we will not be able to have the builder['s] risk polic[ies] continue on a portion of the building" for two reasons—namely, "the builders risk underwriters will not agree to continue coverage once there is occupancy" and "having two separate programs in place covering the same building will create friction in the claims process and cause two separate deductibles to apply."

4

Four days later, on February 9, 2010, Marsh sent the LLC a proposed permanent property insurance policy issued by Factory Mutual Global that would run from February 14, 2010 through February 14, 2011. The LLC paid the $2,359,989.63 premium for that policy. On February 12, 2010, Ashby confirmed that Marsh had purchased the new permanent property insurance policy, and the policy took effect on February 14, 2010.

Approximately 21 months later, in October 2011, Marsh refunded the LLC the amount of premiums the LLC had paid for the builder's risk policies but not used (that is, the coverage from February 14, 2010 to August 1, 2010). That amount came to $256,566.82. None of the builder's risk insurance companies gave written notice that the policies had been "cancelled."

### D.      *The LLC makes a claim under its builder's risk policies*

On May 12, 2010, the LLC reported a claim to the builder's risk insurers for property damage—namely, hairline cracks called "indent fractures" in the natural stone flooring installed in some of the condo units of the high rise. The two subcontractors hired to install that flooring did so in pertinent part by laying an acoustical (sound-proofing) mat atop a concrete slab, laying mortar atop that mat, and laying the specified type of stone atop the mortar. The architect's plans for the installation of the stone flooring called for the mortar layer to be of either thin or medium thickness, and the project manual for how to install the flooring provided for "a medium bed [of mortar] in lieu of a thin set where required to achieve level floor and avoid lippage." The mortar thickness ended up varying from one-eighth of an inch to one and one-eighth inches. Where the layer of mortar was thicker, the shrinking of the mortar as it dried caused indent fractures in some of the stone affixed to the thicker mortar; where the mortar layer was thinner, there were no indent fractures. Thus, although the insurance companies asserted that the inability of the acoustical mat and certain types of stone to compensate for the shrinkage of the mortar contributed to the indent fractures, the LLC and insurance companies were in agreement that the "primary" cause of the fractures was the overly thick application of mortar.

5

Although only a small percentage of the stone flooring developed indent fractures, the LLC sought to replace the stone flooring in approximately 180 of the condo units. The insurance companies' adjuster calculated the cost of removing and replacing that flooring to be approximately $7.5 million, while the LLC calculated those costs to be more than $21.5 million, not including an additional $16 million in related costs.

The insurance companies hired defendant Crawford & Company to investigate the claim, and Crawford appointed James Whipple (Whipple) as its claims adjuster. Whipple hired three consultants to examine the claim: (1) Madsen Kneppers & Associates, as a construction consultant; (2) Ceramic Tile & Stone Consultants, as a tile consultant; and (3) Wiss Janney Elstner Associates, as forensic engineers.

On June 1, 2010, Whipple sent the LLC a letter indicating that the insurance companies were "conducting a thorough investigation of the insurance claim," "reserving their rights under the policy to deny coverage," and "reserv[ing] the right to amend their reservation of rights as additional information is developed." The letter purported to set forth the pertinent provisions of the policies, but erroneously set forth language not found in those policies. The letter stated that there may be additional applicable policy provisions and that the insurance companies reserved the right to assert any other policy provisions that may become pertinent.

Three months later, on September 14, 2010, Whipple sent a further letter providing a "status report" on the investigation and "a supplemental reservation of rights concerning recent developments." This letter summarized several provisions from the applicable policies, including that the policies "insure[] against all risks of direct physical loss of or damage to insured property," and that the policies excluded the "[c]ost of making good faulty or defective workmanship or material" and the "[c]ost of making good fault, defect, error, deficiency or omission in design, plan or specification" unless, as to either, "direct physical loss or damage by an insured peril ensures and then this policy will cover for such ensuing loss or damage only." The letter also set forth the policies' stated term of August 1, 2007 until August 1, 2010, as well as the provision specifying that coverage would expire before this period ended if "any part of the Insured

6

Property" was "plac[ed]" "into commercial service for its intended purpose." The letter did not include the 90-day cancellation provision or spell out the slightly different partial occupancy provisions in the Arch and Great Lakes policies. Nor did it highlight that the June 2010 letter had erroneously cited provisions from a wholly inapplicable policy.

On August 2, 2011, Whipple informed the LLC, in a written letter, that "the Insurers [have] conclude[d] that [the LLC's] claim for the removal and replacement of [the] defective stone tile assemblies is *not* covered by the Insurers' policy." The letter explained the insurance companies' position that "the thicker application of thin-set mortar . . . was a primary factor to what has led to the indent fractures;" that this misapplication of mortar was due to the subcontractors' acts in following the instructions in the project manual to use mortar thickness as a means of leveling the floor; and that the cost of removing and replacing the flooring accordingly fell within Exclusions B and C as the "[c]ost of making good faulty or defective workmanship or material" and/or the "[c]ost of making good fault, defect, error, deficiency or omission in design, plan or specification." The letter also cited the separate exclusions in the policies for "inherent vice" (Exclusion D) and "cracking" (Exclusion M), and further noted that, "[t]o the extent the loss manifested after coverage ceased under the [Insurers'] policy, there is no coverage."

## II.    Procedural Background

### A.    *The LLC's complaint*

In July 2012, the LLC sued the insurance companies, Crawford, and Whipple (collectively, defendants). In the operative, first amended complaint, the LLC sued for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, and (3) fraud. The first two claims were only against the insurance companies; the fraud claim was against all defendants. The LLC alleged two instances of fraud—namely, that (1) Ashby's February 5, 2010 e-mail did not disclose and otherwise misrepresented that two of the policies (namely, the Arch and Great Lakes policies) did not expire immediately upon occupation of any portion of the high rise, which caused the LLC to obtain permanent property insurance five and a half months before it needed to do so, and

7

(2) Whipple's letters in June and September 2010 did not disclose the "all risk" provision of the policies, the "ensuing loss" exception to Exclusions B and C, and the provisions dealing with the expiration and cancellation of the policies. The LLC sought compensatory damages and, on the fraud claim, punitive damages.

All of the defendants demurred to the first amended complaint, but the trial court overruled the demurrer.

### B.    Motions for summary adjudication as to coverage

The LLC moved for summary adjudication of its breach of contract and breach of the implied covenant of good faith and fair dealing claims. The insurance companies filed a cross-motion for summary adjudication on those claims.

The trial court granted the insurance companies' motion and denied the LLC's motion. Because it was undisputed that "the overly thick mortar bed was the primary if not exclusive cause of the cracking of the natural stone," the court concluded that Exclusions B and C for the cost of making good defective design and defective workmanship applied. The court further concluded that the "ensuing loss" exception to those Exclusions did not apply, reasoning that "the cracking of the natural stone was not a severable 'ensuing loss' such that it qualified for the exception to the exclusion."

### C.    Motions for summary judgment on remaining fraud claim

Crawford and Whipple then moved for summary judgment on the fraud claim. The insurance companies filed a similar motion.

The trial court granted both motions. As to the portion of the fraud claim based on Ashby's February 5, 2010 e-mail, the court concluded that Ashby was an employee of the LLC's insurance broker, that her e-mail did not set forth any representation of the insurance companies, and that it would be unreasonable to infer any such representation because Ashby testified during her deposition to a "lack of knowledge regarding any purported conversations with the insurers." The court also concluded that the LLC did not justifiably rely on her e-mail because, in deciding whether to obtain the permanent property insurance policy, (1) the LLC's risk manager "had the policies available to him at all times" and had admitted to reading them, and (2) the LLC was "in pressing need to

8

obtain replacement insurance at exactly the time that it in fact bought replacement insurance," negating any inference that the LLC somehow relied on any representations by the insurance companies *in Ashby's e-mail* in making that decision. As to the portion of the fraud claim based on Whipple's June and September 2010 letters, the court concluded that "the cancellation or partial occupancy provisions had no bearing on the actual handling of the cracked stone claim."

### D. *Entry of judgment and appeal*

The trial court entered judgment for defendants. The LLC thereafter filed a timely notice of appeal.

## DISCUSSION

A trial court may grant summary judgment or summary adjudication to a party upon a showing "that there is no triable issue as to any material fact and that [it] is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) The party moving for summary judgment or summary adjudication bears the initial burden of showing that the opposing party cannot establish "[o]ne or more of the elements of [its] cause of action" or by showing a valid affirmative defense. (*Id.*, § 437c, subds. (o)(1) & (p)(2).) If that burden is met, the "burden shifts" to the opposing party "to show that a triable issue of one or more material facts exists as to that cause of action or [an affirmative] defense." (*Id.*, § 437c, subd. (p)(2).) "'There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.'" (*Burgueno v. Regents of University of California* (2015) 243 Cal.App.4th 1052, 1057, quoting *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850; see also *Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1176, fn. 2 [applying these standards to motions for summary adjudication].) We review a trial court's grant of summary judgment or summary adjudication de novo; what matters is the court's ruling, not its reasoning. (*Burgueno*, at p. 1057; *Ryder v. Lightstorm Entertainment, Inc.* (2016) 246 Cal.App.4th 1064, 1072 (*Ryder*); *Lindstrom v. Hertz Corp.* (2000) 81 Cal.App.4th 644, 648.)

9

## I.  Motion For Summary Adjudication On Contract-Based Claims

### A.  *Breach of contract*

To prevail on a claim for breach of contract, a plaintiff must establish "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)  In interpreting a contract, we start with the "'clear and explicit' meaning of the [contract's] provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage.'" (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647-648 (*MacKinnon*), quoting Civ. Code, § 1644.)  We are not bound by the trial court's interpretation of a contract. (*Id.* at p. 647.)  Once the meaning of an insurance contract is settled, "[t]he burden is on the insured to establish that [its] claim is within the basic scope of the coverage and on the insurer to establish that the claim is specifically excluded." (*Id.* at p. 648.)

The trial court properly concluded that the cost of removing and replacing the stone was not covered by the builder's risk policies.  Although the builder's risk policies covered "all risks of direct physical loss or of damage to insured property . . . ," the policies went on to exclude (in Exclusions B and C) the "[c]ost of making good" (that is, removing and replacing) any "faulty or defective workmanship or material" and any "fault, defect, error, deficiency or omission in design, plan or specification."  What is more, it was undisputed that the "primary cause" of the indent fractures in the stone was the overly thick application of mortar, which was itself the product of the architect's deficient plans authorizing a medium-thick layer of mortar and the project manual directing thicker application of mortar when necessary to level the floor, as well as the defective workmanship of the subcontractors in following those plans and the project manual.  Consequently, whether the damage to the stone is covered by the insurance policies turns on two questions:  (1) is the cost of repairing the stone part of the "cost of making good" the faulty design and workmanship with the mortar, so as to be excluded from coverage by Exclusions B and C; and, if so, (2) is the damage to the stone a "direct

physical loss or damage by an insured peril," so as to be covered by the "ensuing loss" exception to Exclusions B and C?

### 1. Cost of making good

A "cost of making good" provision excludes from coverage a contractor's "own work," thereby placing "the risk of replacing or repairing [a contractor's] defective work or product" on that *contractor's* insurer rather than the general contractor or builder's insurer. (*CalFarm Ins. Co. v. Krusiewicz* (2005) 131 Cal.App.4th 273, 287; *Southern Cal. Edison Co. v. Harbor Ins. Co.* (1978) 83 Cal.App.3d 747, 756-757.) Consistent with this purpose, a "cost of making good" provision excludes from coverage not only the cost to repair or replace the contractor's defective work, but also the cost to replace or repair "'the [contractor's] satisfactory work that is damaged by the . . . defective work.'" (*CalFarm*, at p. 288, quoting *Diamond Heights Homeowners Assn. v. National American Ins. Co.* (1991) 227 Cal.App.3d 563, 571; see also *Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 111; cf. *Southern Cal. Edison Co.*, at pp. 755-756.) Also consistent with this purpose, a "cost of making good" provision does not exclude from coverage the cost to repair or replace damage to "*other* property," thereby leaving it to the general contractor's or builder's insurer. (*Southern Cal. Edison Co.*, at pp. 755-756, italics added; *CalFarm*, at p. 287; *Armstrong*, at p. 111.)

Here, the defective design and installation of one part of the flooring (the mortar) damaged another, satisfactorily designed and installed part of the flooring (the stone). Because only one subcontractor installed the flooring in any given room, and because it is physically impossible to replace the mortar without replacing the stone sitting atop it, the "cost of making good" provision excluded from coverage the cost of replacing or repairing the stone as well as the mortar. (Accord, *Golden Eagle Ins. Co. v. Travelers Companies* (9th Cir. 1996) 103 F.3d 750, 757 [cost of replacing satisfactorily installed flooring in order to repair defective concrete under-flooring excluded by "defective workmanship" provision].) Although the LLC's expert stated that the flooring was installed through "a sequence of construction using different contractors starting with the

11

subfloors and working upwards over a period of months until owner-supplied stone tile finishes were installed," this statement is consistent with the division of labor between the subcontractors and does not create a material dispute as to the applicability of the "cost of making good" provision.

The LLC argues that the preambles to Exclusions B and C in each of the policies dictates a result in its favor. The preambles state that the "polic[ies] shall not pay for loss, damage or expense caused directly or indirectly and / or contributed to, in whole or in part, by" the "[c]ost of making good faulty or defective workmanship" (in Exclusion B) or the "[c]ost of making good . . . [defective] design" (in Exclusion C). The LLC asserts that, read literally, this language means that Exclusions B and C do not reach the cost of replacing stone that is damaged by the defective design and installation of the mortar because such damage was caused by the defective mortar, not by the "cost of making good" the defective mortar. We reject this reading of the preambles. If we accepted the LLC's reading, we would be required to conclude that Exclusions B and C also do not reach the damages corresponding to the cost of replacing the defective mortar because those damages were caused by the defective design and installation of the mortar, not by the "cost of making good" the defective mortar. Yet even the LLC recognizes and concedes that Exclusions B and C exclude the cost of replacing the defective mortar. Because we must avoid absurd results when interpreting insurance policies (e.g., *MacKinnon*, *supra*, 31 Cal.4th at p. 650 ["'insurance policies will not be construed to reach an absurd result'"]), we reject the LLC's preamble-based argument.

2.    *Ensuing loss*

An "ensuing loss" provision provides for coverage when an original, excluded peril triggers a second, subsequent peril that "causes a loss or injury *separate* and *independent* . . . from the original excluded peril." (*Acme Galvanizing Co. v. Fireman's Fund Ins. Co.* (1990) 221 Cal.App.3d 170, 179-180 (*Acme Galvanizing*); Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2015) ¶ 6:322.5, p. 6B-63.) In *Murray v. State Farm Fire & Casualty Co.* (1990) 219 Cal.App.3d 58 (*Murray*), a corroded pipe caused the adjacent soil to become saturated and the ground to settle,

12

which in turn caused a crack in the concrete slab beneath a home. The court ruled that the ground settling qualified as an "ensuing loss," but that the insured was nevertheless precluded from coverage because his policy also happened to exclude damage due to "settling." (*Id.* at pp. 62-65.) By contrast, in *Acme Galvanizing*, a steel kettle containing molten zinc came apart and spewed zinc all over surrounding industrial equipment. Because the defect with the kettle was excluded from coverage as a latent defect, the insured sought to collect for damage to the equipment under an "ensuing peril" clause. The court rejected this argument: "[T]here was no peril separate from and in addition to the initial excluded peril of the welding failure and kettle rupture. The spillage of molten zinc was part of the loss directly caused by such peril, not a new hazard or phenomenon." (*Acme Galvanizing*, at pp. 179-180.)

*Acme Galvanizing* is directly on point. *Acme Galvanizing* makes clear that an "ensuing peril" provision applies only if there is, in fact, a second and subsequent "peril." A "peril" is "a hazard or occurrence which causes a loss or injury." (*Acme Galvanizing*, *supra*, 221 Cal.App.3d at pp. 179-180; *Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446, 465, fn. 13 ["[a] peril is usually understood as the physical force that brings about the loss"]; *Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co.* (1997) 60 Cal.App.4th 400, 405, fn. 4 [same].) Critically, a peril is *not* the loss or injury itself. Here, as in *Acme Galvanizing*, the original, excluded peril did not cause a second, covered peril; instead, the original, excluded peril (the defective mortar) directly caused the very damage for which the insured is seeking recovery (the cracked stone). Here, as in *Acme Galvanizing*, the "ensuing peril" clause does not cover such damage. If it did, an ensuing peril exception would effectively negate the exclusion(s) to which it applies; we may not construe a contract in a manner that nullifies any of its language. (E.g., *Food Pro Internat., Inc. v. Farmers Ins. Exchange* (2008) 169 Cal.App.4th 976, 992; *Westoil Terminals Co., Inc. v. Industrial Indemnity Co.* (2003) 110 Cal.App.4th 139, 150.)

13

### 3. The LLC's arguments

The LLC offers four challenges to this reasoning. First, the LLC argues the ensuing peril clause applies because there *is* a second "peril." In the LLC's view, the overly thick mortar is the original, excluded peril; this peril caused extraordinary cracking, which is a second, insured peril (because the policy only excludes "[n]ormal . . . cracking . . . of . . . floors"); and the extraordinary cracking caused the damage necessitating repair. We reject this argument because the cracking of the stone (extraordinary or not) is the very damage necessitating repair. (See, e.g., *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.* (5th Cir. 2000) 219 F.3d 501, 506 [rejecting similar proffered dichotomy between "cracking" and "material impairment" of a foundation because "[t]he cracking *is* the impairment; they are synonymous"].) We are therefore unpersuaded by the LLC's attempt to split this atom.

Second, the LLC assails two of the trial court's evidentiary rulings. Although there is still some uncertainty as to whether a trial court's evidentiary rulings on a summary judgment motion are to be reviewed de novo or for an abuse of discretion (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 [noting uncertainty]; *Ryder*, *supra*, 246 Cal.App.4th at p. 1072 [applying abuse of discretion review]), this uncertainty does not matter here because neither ruling challenged by the LLC on appeal matters to our analysis. The LLC argues that the court erred in overruling its hearsay and foundational objections to the reports submitted by the three consultants Whipple hired. Even if we assume this ruling was incorrect, the LLC has itself admitted the key findings from those reports—namely, that the primary cause of the indent fractures was the overly thick application of mortar, and that the architect's plans authorized and project manual directed that thicker application to level the flooring. The LLC also argues that the court erred in considering the protocol the LLC adopted for replacing the damaged flooring because that protocol constitutes a subsequent remedial measure inadmissible under Evidence Code section 1151. Because we reach our conclusion that the damage to the stone is not a "peril" without considering the LLC's replacement protocol, any error here is irrelevant and hence not prejudicial. (E.g., *Grail Semiconductor, Inc. v. Mitsubishi*

14

*Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 799 ["[a] judgment of the trial court may not be reversed on the basis of the erroneous admission of evidence, unless that error was prejudicial"], citing Code Civ. Proc., § 475.)

Third, the LLC contends that there are several remaining factual disputes that preclude summary judgment. These include: (1) whether the type of stone and type of acoustical mat also contributed to the indent fractures; and (2) whether the manner in which the flooring was installed—that is, the stone atop the mortar atop the acoustical mat—constitutes a unified "assembly" or multitude of divisible assemblies. Because insurance law looks to the "efficient proximate cause" in assessing whether a claimed loss is covered by a policy (*Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 754), because the "efficient proximate cause" is defined as "the predominant, or most important cause of a loss" (*ibid.*), and because it is undisputed that the "primary cause" of the damage to the stone was the overly thick application of mortar, a dispute over whether there are additional, contributing causes is not material. Similarly, because summary judgment is warranted due to each subcontractor's installation of all of the flooring in any given room and due to the absence of any second, ensuing peril, it does not matter whether the flooring is conceived of as a single assembly or as multiple assemblies. In sum, the factual disputes the LLC identifies are not material, so they do not preclude summary judgment. (*Beninati v. Black Rock City, LLC* (2009) 175 Cal.App.4th 650, 656 ["'a litigant may not avoid summary judgment by attempting to generate disputes of fact as to issues which are not material to the legal theories and claims in issue'"].)

Lastly, the LLC urges we are required, when interpreting insurance policies, to construe provisions excluding coverage narrowly and provisions extending coverage broadly. (*MacKinnon*, *supra*, 31 Cal.4th at p. 648.) This is true, but our chief task, as noted above, is to adhere to the "'clear and explicit'" meaning of a policy's provisions because that is the meaning that best accords with the "'mutual intention' of the parties." (*Id.* at pp. 647-648, quoting Civ. Code, §§ 1636 & 1644.) Here, the "ensuing peril"

clause is clear and explicit; we are not at liberty to rewrite it in the guise of construing it narrowly.

Because the undisputed evidence establishes that the insurance companies' denial of coverage was supported by the language contained in the LLC's policies, the trial court properly granted summary judgment to the insurance companies on the LLC's breach of contract claim.

### B. *Breach of the implied covenant of good faith and fair dealing*

To establish a claim for breach of the implied covenant of good faith and fair dealing in the context of a denial of insurance benefits, "an insured must show [(1)] that benefits were due under the policy, and [(2)] that the[se] benefits were withheld without proper cause." (*Benavides v. State Farm General Ins. Co.* (2006) 136 Cal.App.4th 1241, 1250 (*Benavides*).) The threshold requirement that benefits be due exists because the implied covenant of good faith and fair dealing is "a *supplement* to the express contractual covenants." (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1153 (*Love*).) "[W]hen benefits are due [to] an insured, delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because it frustrates the insured's *primary* right to receive the benefits of his contract—i.e., prompt compensation for losses. Absent that primary right, however, the *auxiliary* implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings." (*Ibid.*; accord, *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36, citing *Love*, at p. 1153.)

Because, as explained above, no benefits are due under the builder's risk policies, the insurance companies also prevail on the LLC's auxiliary claim for breach of the implied covenant of good faith and fair dealing. (*San Diego Housing Com. v. Industrial Indemnity Co.* (1998) 68 Cal.App.4th 526, 544 ["[w]here a breach of contract cannot be shown, there is no basis for a finding of breach of the covenant [of good faith and fair dealing]"]; *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390,

16

408 ["without coverage, there can be no liability for bad faith on the part of the insurer"]; *Love*, *supra*, 221 Cal.App.3d at p. 1153 [same].) The LLC's arguments on appeal that insurance companies may still be liable for breach of the implied covenant for conducting an inadequate investigation, for misrepresenting and concealing provisions of the policies, and for trying to retroactively cancel the policies after the damage to the stone was reported are squarely foreclosed by the law set forth above. (See also *Benavides*, *supra*, 136 Cal.App.4th at p. 1250 ["[i]f the insurer's investigation—adequate or not— results in a *correct* conclusion of no coverage, no tort liability arises for breach of the implied covenant"]; *Murray*, *supra*, 219 Cal.App.3d at p. 66 ["the fact that the investigation yielded a correct conclusion precludes any claim that the inadequacy caused any damage"].)

## II.    Motion for Summary Judgment On the Fraud Claim

To prevail on a claim for "fraud based on concealment," a plaintiff must prove that (1) the defendant misrepresented a material fact through false representation, concealment or nondisclosure, (2) the defendant knew of the falsity of its misrepresentation, (3) the defendant acted with the intent to defraud by inducing the plaintiff to rely on its misrepresentation, (4) the plaintiff justifiably relied on the defendant's misrepresentation, and (5) the plaintiff suffered damage. (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 845.) "[T]o establish fraud through nondisclosure or concealment of facts, it is [also] necessary to show the defendant 'was under a legal duty to disclose [those facts].' [Citation]." (*Ibid.*)

### A.    *Fraud claim based on Ashby's February 5, 2010 e-mail*

The trial court concluded that the insurance companies were entitled to summary judgment on the portion of the LLC's fraud claim based on Ashby's February 5, 2010 e-mail because (1) Ashby's e-mail did not expressly or impliedly reflect any false representations or concealments *by the insurance companies*, and (2) the LLC did not in any event justifiably rely on Ashby's e-mail in deciding whether to obtain the permanent

17

property insurance from Factory Mutual Global.  We do not address the court's first rationale because we agree with its second rationale.

The LLC has not established any triable issue of material fact as to justifiable reliance for two reasons.  First, the LLC had copies of the policies and was accordingly aware of their expiration provisions.  Although insurers have a duty to call an insured's attention to "all benefits, coverage, time limits or other provisions of any insurance policy issued by that insurer that may apply to the claim presented by the claimant," that duty attaches only when a "claim [has been] presented by the claimant."  (Cal. Code Regs., tit. 10, § 2695.4, subd. (a); *Superior Dispatch, Inc. v. Insurance Corp. of New York* (2010) 181 Cal.App.4th 175, 189-190; *Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1272-1273 (*Spray, Gould & Bowers*).)  Any other time, """""[i]t is the duty *of the insured* to read his policy"""""" and the insured """""cannot . . . complain that he did not read it or know its terms.  [Citations.]""""""  (*Mission Viejo Emergency Medical Associates v. Beta Healthcare Group* (2011) 197 Cal.App.4th 1146, 1155, italics added.)  The LLC was looking for permanent property insurance in the fall of 2009, six months before filing any claim with the insurance companies.  As a result, it was the LLC's duty to read its policies and know the terms and early expiration provisions of those policies.  Because the LLC indisputably possessed a copy of each of the policies, it is undisputed that the LLC was not "unaware" of the policies' actual terms and thus could not have justifiably relied upon the insurance companies' alleged concealment or misrepresentation of those terms.

Second, Ashby sent her e-mail at the tail end of the LLC's months-long process of working with Marsh to find a new insurer and to negotiate a permanent property insurance policy that would replace the five builder's risk insurance policies that were about to expire in their entirety upon the opening of the Marriott hotel and the Arch and Great Lakes policies that were about to expire as to the occupied portions of the high

rise.[2] There is no evidence that representations of the insurance companies implied in Ashby's February 5, 2010 e-mail were what caused the LLC to seek or ultimately purchase replacement insurance. The LLC points to one of its discovery responses and to an allegation in its first amendment complaint. But the discovery response does not refer to Ashby's e-mail at all and does not assert that representations made by the insurance companies and relayed in her e-mail were the reason why the LLC initially sought and ultimately purchased replacement insurance. And allegations in the LLC's complaint are allegations, not evidence. (*Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220, 241.) Nor is it reasonable to infer that any of the contents of Ashby's February 5, 2010 e-mail were what prompted the LLC to start looking for a permanent property insurance policy two months before that e-mail was sent or prompted the LLC to purchase that insurance days later after months of negotiating and finalizing that policy. (Cf. *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470 [courts evaluating summary judgment motions should draw reasonable inferences in favor of the nonmoving party].) For much the same reason, we reject the LLC's argument that the insurance companies somehow ratified Marsh's statements when they refunded to the LLC the portion of the premiums attributable to the period after the policies expired, as those refunds were a function of the policies themselves and not of anything Marsh did or did not say.

---

[2] The LLC ostensibly did not sue the insurance companies for *Ashby's* earlier representations that the builder's risk policies would expire when the Marriott hotel opened because any misrepresentations came from Ashby, who worked for the LLC's own insurance broker, and not from the insurance companies. The LLC seems to suggest that Ashby's earlier representations might be attributable to the insurance companies because Ashby's employer (Marsh) had, back in 1996, signed a contract agreeing to serve as an agent for Continental and 20 other, unrelated insurance companies. By definition, this would mean that Ashby would, at most, have been speaking for Continental, which was responsible for 3.5 percent of the LLC's policy; Ashby would not have spoken for the insurers backing the remaining 96.5 percent. Moreover, because the 1996 contract did not in any event empower Marsh to contradict the written terms of any Continental policy, Ashby lacked the authority to modify the terms of Continental's policy with the LLC through her alleged oral statements.

19

Crawford and Whipple are also entitled to summary judgment on this portion of the LLC's fraud claim for the simple reason that they had nothing to do with Ashby's February 5, 2010 e-mail; they did not become involved until the LLC filed its claim several months later in May 2010.

**B.     Concealment claim based on Whipple's June 2010 and September 2010 reservation of rights letters**

The trial court concluded that defendants were entitled to summary judgment on the portion of the LLC's fraud claim based on Whipple's June 2010 and September 2010 reservation of rights letters because the only policy provisions that were not disclosed in those letters did not form the insurance companies' basis for denying coverage. We agree with the court's analysis.

Although, as noted above, an insurer presented with a claim has a duty to call an insured's attention to any "provisions of any insurance policy . . . that may apply" (Cal. Code Regs., tit. 10, § 2695.4, subd. (a); *Spray, Gould & Bowers*, *supra*, 71 Cal.App.4th at pp. 1272-1273), defendants fulfilled that duty in the September 2010 reservation of rights letter. Contrary to what the LLC alleges in its complaint, the September 2010 letter set forth the "all risk" coverage provision of the policy, Exclusions B and C to that coverage, the "ensuing loss" exception to those Exclusions, and the expiration provisions of the policies. The only additional provisions that the LLC alleges should have been disclosed were the 90-day cancellation provisions of the policies and the limited partial occupancy provisions in the Arch and Great Lakes policies. However, as discussed above, the denial of coverage ultimately and independently rested on the provisions of the policies that *were* disclosed. Thus, whether or not defendants violated their duty to disclose the cancellation and limited partial occupancy provisions because those provisions "may [have] appl[ied]," the LLC did not suffer any damage by their omission from the September 2010 letter. The LLC's alternative claim that defendants did not highlight in the September 2010 letter that the June 2010 letter erroneously cited provisions from an inapplicable insurance policy fails for the same reason: Defendants corrected their error in the September 2010 letter and in the August 2011 denial letter,

20

and the LLC was not injured by absence of verbiage highlighting the mistake, particularly when the LLC had both letters and could have compared them itself.

## DISPOSITION

The judgment is affirmed.  Defendants are entitled to their costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
HOFFSTADT

We concur:

_____, Acting P. J.
ASHMANN-GERST

_____, J.
CHAVEZ

21